# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

*Plaintiff,*

vs.

Case No. 17-10151-EFM-1

TERRY LEE OCKERT, JR.,

*Defendant.*

## MEMORANDUM AND ORDER

Defendant Terry Lee Ockert, Jr., was travelling westbound on 63rd Street south when Sedgwick County Deputy Sheriff Kaleb Dailey stopped his vehicle for crossing the center line. After arresting Ockert for driving without a valid license, Deputy Dailey saw a large firearm and a cigarette box containing what he believed to be methamphetamine through the vehicle's window. Deputy Dailey and another deputy sheriff entered the vehicle and seized the firearm and methamphetamine.

Ockert now claims that the initial stop, his arrest, and the subsequent search of the vehicle were unconstitutional. He seeks to suppress the firearm and all other evidence seized from his car. Because the Court concludes that Deputy Dailey made a lawful traffic stop and had probable cause to search the vehicle, the Court denies Ockert's Motion to Suppress (Doc. 35).

## I. Factual and Procedural Background

In the early hours of June 18, 2017, Deputy Dailey was travelling westbound in his patrol car on 63rd Street south near Haysville, Kansas. Around 1:20 a.m., Deputy Dailey observed Ockert also travelling westbound on 63rd Street about three to four blocks ahead of him. Deputy Dailey saw Ockert's vehicle cross the center line of 63rd Street. He sped up to close the distance between his patrol car and the vehicle but did not turn on his emergency lights. After the vehicle crossed the railroad tracks several blocks later, Deputy Dailey caught up to it and engaged his emergency lights, which activated the recording mechanism on the patrol vehicle's dash cam.[1]

Video recording from the dash cam shows that Deputy Dailey was initially traveling about 70 m.p.h. toward Ockert's vehicle, which is 25 m.p.h. over the posted speed limit.[2] At 1:22:12 a.m., the deputy's speed slowed to 63 m.p.h., and at 1:22:16, he slowed to 55 m.p.h. The video also shows that at 1:22:16 Ockert's vehicle crossed the center line of 63rd street for a couple of seconds and then returned to the center of the westbound lane.

No environmental factors caused or contributed to Ockert's failure to maintain his vehicle in the westbound lane of 63rd Street. The skies were clear and the temperature was approximately 75 degrees. There were no heavy winds or safety hazards blocking the roadway.

After crossing the railroad tracks, Ockert pulled into a private drive. Deputy Dailey followed him, and by the time he parked his patrol vehicle, Ockert was already getting out of his

---

[1] According to Deputy Dailey's testimony, the patrol vehicle's dash cam is on while the vehicle is running. The dash cam begins to record when the patrol vehicle's emergency lights are engaged. The dash cam's software, however, preserves the thirty seconds of video preceding the engagement of the emergency lights. Thus, the first thirty seconds of video lack audio recording, but there is audio and video recording from the time at which the emergency lights were initiated.

[2] During the hearing, Deputy Dailey admitted that travelling above the speed limit without turning on his emergency lights violated the Sheriff Department's policy. This admission, however, does not impact the Court's findings regarding the legality of the traffic stop.

car. Deputy Daily informed Ockert that he pulled him over because he drove left of center. He then asked Ockert if he had his driver's license or any other identification, to which Ockert responded that he did not. Deputy Dailey patted Ockert down for weapons and took his identifying information. He then said to Ockert "I'm guessing the reason I saw you go left of center is probably cause you were watching me behind ya, coming up behind ya." Ockert responded, "Yeah, I saw you come up really fast so." Deputy Dailey then told Ockert to "hang tight" and returned to his patrol car to contact Spider for outstanding warrants.

At 1:30:12 a.m., Sedgwick County Deputy Sheriff Cody Rexroat arrived to assist Deputy Dailey. Deputy Dailey explained to Deputy Rexroat why he pulled Ockert over and told Rexroat he was waiting on a report from Spider. Ockert then asked Deputy Dailey if he had any outstanding warrants. When Deputy Dailey responded that he didn't know, Ockert informed him that he had a warrant in "Abilene" and that his license was restricted for a DUI.

During this conversation, Deputy Rexroat approached the passenger side of Ockert's vehicle and looked in the windows using his flashlight. Deputy Dailey and Deputy Rexroat then had a conversation in which Rexroat indicated that he could smell marijuana coming from the car and that there was a firearm located in the car. Deputy Dailey testified that after this conversation he walked to the rear of Ockert's car and smelled marijuana as well. When he told Ockert this, Ockert denied that there was marijuana in the vehicle, but said "If you would've said meth or something maybe, no uh, no . . . ." Ockert also told Deputy Dailey that he could not search his car. At this point, at approximately 1:33:40 a.m., Deputy Dailey arrested Ockert for driving on a suspended license without an interlock device.

After arresting the Defendant, Deputies Dailey and Rexroat continued to walk around the vehicle and look inside its windows. Deputy Dailey commented about an odor of marijuana and

opined that he was "pretty sure" that Ockert was a convicted felon. A little later, Deputy Dailey looked into the front passenger window and saw a black and white cigarette box with a plastic bag sticking out of it. The bag contained a white or clear substance that he suspected was methamphetamine. Deputy Dailey opened the car door, removed the cigarette box from the passenger seat, and confirmed that it contained methamphetamine. The officers then searched the vehicle and seized a loaded .22 caliber rifle and a 100-round capacity drum magazine for the rifle. In addition, the investigation revealed that the VIN number plates had been changed and that the vehicle was stolen.

On October 11, 2017, the grand jury returned an indictment charging Reynolds with one count of possession of a firearm by a prohibited person. Ockert subsequently filed a Motion to Suppress asking the Court to suppress all evidence found within his vehicle. Ockert primarily challenges the initial stop of his vehicle, but in the alternative, he also challenges (1) the length of the traffic stop; (2) his arrest; and (3) the search of his vehicle. The Court held a hearing on Ockert's motion.

## II.     Analysis

**A.     The traffic stop did not violate the Fourth Amendment.**

Ockert contends that the traffic stop in this case violates the Fourth Amendment because Deputy Dailey lacked reasonable suspicion that Ockert committed a traffic violation. The Fourth Amendment protects individuals from unreasonable searches and seizures. A traffic stop is a seizure under the Fourth Amendment, and thus must be reasonable.[3]  "[A] traffic stop is reasonable if it is (1) justified at its inception and (2) reasonably related in scope to the circumstances which

---

[3] *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000).

justified the interference in the first place."[4] A stop is justified at its inception if the officer has reasonable suspicion that the motorist has violated an applicable traffic regulation.[5]

The Government argues that the traffic stop was reasonable because Deputy Dailey had reasonable suspicion that Ockert violated K.S.A. 8-1522(a). That statute provides: "A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." The Kansas Supreme Court construed this statute in *State v. Marx*.[6] It concluded that "K.S.A. 8-1522(a) is not a strict liability offense" and requires "more than an observation of one instance of a momentary lane breach."[7] Whether the statute is violated depends on the entire context of the case, including weather conditions or obstacles in the road.[8] The *Marx* court held that a vehicle's crossing the line once, and then overcorrecting briefly across the centerline within a half-mile to one-mile distance, did not provide reasonable suspicion that the statute was violated.[9]

At the suppression hearing, Deputy Dailey testified that while he was travelling westbound on 63rd Street, he observed Ockert's vehicle, which was also travelling westbound on 63rd Street, cross the center line in violation of K.S.A. 8-1522(a). He also testified that as he accelerated to catch up to Ockert, he saw Ockert's vehicle cross the center line for a second time. The dash cam video only recorded the alleged second violation of K.S.A. 8-1522(a), but that recording shows

---

[4] *United States v. Karam*, 496 F.3d 1157, 1161 (10th Cir. 2007) (internal quotation marks and citation omitted).

[5] *United States v. Cunningham*, 630 F. App'x 873, 876 (10th Cir. 2015).

[6] 289 Kan. 657, 215 P.3d 601 (2009).

[7] *Id*. at 612.

[8] *Id*.

[9] *Id*. at 613.

Ockert's left rear tire crossing the center line for two to three seconds. In addition, based on Deputy Dailey's testimony and the dash cam video recording, there was no weather condition or other obstacle in the road that would make staying in one's lane impracticable. Accordingly, Deputy Dailey had reasonable suspicion to believe that Ockert violated the statute.

Ockert contends that Deputy Dailey did not have reasonable suspicion to stop his vehicle because his second alleged infraction of K.S.A. 8-1522(a) was caused by Deputy Dailey's own conduct. Ockert argues that it was not practical for him to maintain his lane of travel because Deputy Dailey was approaching him at a high rate of speed without engaging his emergency lights. According to Ockert, Deputy Dailey acknowledged this fact when he asked Ockert during the traffic stop whether he left his lane because the patrol vehicle was approaching so quickly from behind.

In support of his argument, Ockert relies on another case from this District—*United States v. Ochoa*.[10] In that case, a Lincoln was travelling along Interstate 70 closely followed by a Toyota. Two troopers, who were driving an unidentifiable patrol car, thought that the vehicles may be travelling together, so they pulled into a passing lane and traveled next to the Toyota for 15 seconds to observe its occupants.[11] During that time, they observed the Lincoln briefly drift out of its lane.[12] The troopers then pulled next to the Lincoln to observe its occupants and later pulled over the Lincoln for failing to maintain its lane of travel.[13] The troopers ultimately recovered 222

---

[10] 4 F. Supp. 2d 1007 (D. Kan. 1998).

[11] *Id*.

[12] *Id*.

[13] *Id*.

pounds of marijuana from the Lincoln, and the occupants of the Lincoln challenged the initial traffic stop.[14] Judge Marten held that the troopers' conduct could have caused the driver of the Lincoln to drift out of his lane, and thus the single crossing on the shoulder did not violate Kansas law.[15]

The Court does not find *Ochoa* persuasive. In that case, Judge Marten relied heavily on the fact that the defendant's vehicle initially did nothing wrong before the troopers decided to pull next to the Toyota, whereas in this case, Deputy Dailey testified that he observed Ockert crossing the center line before he accelerated his vehicle to catch up to him. Furthermore, the facts of this case are much subtler than those in *Ochoa*. As the Court noted, the driver of the Lincoln was being followed too closely by the Toyota with an unidentifiable patrol car maintaining a position directly beside it for a period of 15 seconds. This "commotion" could have caused a reasonable driver to become distracted and look to see what was going on, causing the vehicle to drift onto the shoulder.[16] Deputy Dailey's acceleration toward Ockert's vehicle did not create nearly such "commotion" here.

While Ockert has pointed to several facts that may be relevant to whether he actually violated K.S.A. 8-1522(a), *i.e.*, Deputy Dailey's speed in approaching his vehicle and Deputy Dailey's failure to use his emergency lights, these facts do not affect the Court's ultimate determination of whether Deputy Dailey had reasonable suspicion that Ockert committed the

---

[14] *Id*. at 1010-11.

[15] *Id*. at 1011.

[16] *Id*. at 1012.

traffic violation.[17] Reasonable suspicion requires "considerably less than proof of wrongdoing by a preponderance of the evidence."[18] As noted above, Deputy Dailey observed Ockert's vehicle cross the center line twice within a relatively short distance.[19] There were no obstacles in Ockert's lane of travel and no adverse weather conditions. Therefore, the traffic stop was lawful under the Fourth Amendment.

**B.      The traffic stop was not unreasonably delayed.**

In the alternative, Defendant argues that Deputy Dailey unreasonably delayed the traffic stop by failing to run Ockert's information while waiting for Deputy Rexroat to arrive. "[A] traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket."[20] In other words, "[t]he seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'"[21] "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries

---

[17] Although Deputy Dailey may have insinuated that Ockert crossed the center line because of his accelerated speed, Deputy Dailey never admitted this was the case. Deputy Dailey also explained at the hearing that he made such statement to diffuse the escalating tension between him and Ockert during the traffic stop.

[18] *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

[19] In what the Court has interpreted as an attempt to undermine Deputy Dailey's credibility regarding what he observed before the dash cam began recording, Ockert argued at the hearing that Deputies Dailey and Rexroat did not actually smell marijuana coming from his vehicle during the stop. Although this argument is reasonable and supported by the evidence, the Court declines to address this issue because the alleged smell of marijuana is not relevant to the lawfulness of the traffic stop.

[20] *Rodriguez v. United States*, -- U.S. --, 135 S. Ct. 1609, 1614-15 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

[21] *Id*. at 1615 (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)).

incident to [the traffic] stop.' "[22] This includes checking the driver's license and determining whether there are outstanding warrants against the driver.[23]

There was no unreasonable delay in this case between the initiation of the traffic stop and Defendant Dailey running Ockert's information on Spider. The dash cam video shows that upon meeting Ockert outside of his vehicle, Deputy Dailey asked him if he had his driver's license, and Ockert responded that he did not. Deputy Dailey then took Ockert's identifying information and contacted Spider. There is no evidence that Deputy Dailey engaged in any unrelated investigation that lengthened the roadside detention. Thus, Deputy Dailey did not unduly lengthen the duration of the stop.

**C.    Deputy Dailey had probable cause to arrest Ockert.**

Ockert contends that his arrest was unlawful because he was arrested for merely exercising his constitutional rights and refusing to consent to a search of his vehicle. The evidence presented at the hearing does not support this argument. Moreover, Deputy Dailey had probable cause to arrest Ockert because he was driving on a suspended license. Under K.S.A. 8-262, "[a]ny person who drives a motor vehicle on any highway of this state at a time when such person's privilege so to do is canceled, suspended or revoked . . . shall be guilty" of a misdemeanor. An officer can arrest a person for driving without a valid license in violation of this statute.[24] Therefore, Ockert's arrest was not unlawful.

**D.    The Deputies had probable cause to search the vehicle under the plain view doctrine.**

---

[22] *Id.* (quoting *Caballes*, 543 U.S. at 408).

[23] *Id.*

[24] *See United States v. Sanchez*, 2011 WL 6091744, at *5 (D. Kan. 2011) (finding that a trooper had probable cause to arrest the defendant when he learned that he was driving on a suspended license).

Finally, Ockert challenges the seizure of evidence from his vehicle by arguing that the deputies did not have probable cause to search it. In response, the Government argues that the search was permissible under both the automobile exception and plain view doctrine. The Court concludes that both exceptions apply to this case.

The Fourth Amendment generally requires police to obtain a warrant before conducting a vehicle search.[25] Police officers, however, may search a vehicle if the circumstances are such that the "automobile exception" applies.[26] Under this exception, "police officers who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant."[27] "Probable cause to search an automobile exists 'where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.' "[28]

The "plain view doctrine" allows an officer to seize evidence of a crime without obtaining a warrant if "(1) the officer was lawfully in a position from which the object seized was in plain view; (2) the object's incriminating character was immediately apparent . . .; and (3) the officer had a lawful right of access to the object."[29] The plain view doctrine and automobile exception have been used in combination to uphold warrantless vehicle searches.[30] For example, "if an

---

[25] *California v. Carney*, 471 U.S. 386, 390 (1985).

[26] *United States v. Vasquez*, 555 F.3d 923, 930 (10th Cir. 2009) (citation omitted); *Florida v. Meyers*, 466 U.S. 380, 381 (1984) (per curiam).

[27] *Vasquez*, 555 F.3d at 930 (quoting *Meyers*, 466 U.S. at 381).

[28] *United States v. Montes-Ramos*, 347 F. App'x 383, 395-96 (10th Cir. 2009) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1966)).

[29] *Id.* at 390 (quoting *United States v. Angelos*, 433 F.3d 738, 747 (10th Cir. 2006)) (internal quotation marks omitted).

[30] *United States v. Sparks*, 291 F.3d 683, 690 (10th Cir. 2002).

officer has lawfully observed an object of incriminating character in plain view in a vehicle, that observation, either alone or in combination with additional facts, has been held sufficient to allow the officer to conduct a probable cause search of the vehicle."[31]

Here, Deputy Dailey saw a cigarette box laying on the passenger seat while he was looking in Ockert's front passenger window. A plastic bag containing a white or clear substance was sticking out of the cigarette box. Based on his training and experience, Deputy Dailey believed the substance was contraband or a controlled substance. He then entered the vehicle, collected the cigarette box, and confirmed that the substance was methamphetamine.

The seizure of the cigarette box was justified under the plain view exception. First, Deputy Dailey saw the white or clear substance when looking through Ockert's vehicle. Second, he believed the substance to be contraband from his training and experience. And, third, Deputy Dailey had a lawful right of access to the vehicle because he stopped Ockert pursuant to a lawful traffic stop. Therefore, Deputy Dailey had authority to seize the cigarette box with the suspected methamphetamine under the plain view doctrine.

Deputy Dailey and Deputy Rexroat also had authority under the plain view doctrine to seize the firearm. Like the methamphetamine, the deputies observed the firearm when looking through the passenger window of Ockert's vehicle. The deputies also had probable cause to believe the firearm was contraband. Deputy Dailey testified that he knew Ockert from previous interactions with him while Deputy Dailey was employed in the detention division of the Sedgwick County Sheriff's Office. In addition, before he seized the firearm, Deputy Dailey received confirmation from the Sheriff's office records department that Ockert was a convicted felon. And

---

[31] *Id.*

finally, the deputies had a lawful right of access to the firearm because they viewed the firearm in Ockert's vehicle during a lawful traffic stop. Accordingly, the seizure of the firearm did not violate the Fourth Amendment.

### III. Conclusion

Deputy Dailey reasonably believed that Ockert committed a traffic violation while driving on 63rd Street on June 17, 2018, and therefore, the traffic stop was lawful. Deputy Dailey did not unreasonably extend the scope or duration of the stop before contacting Spider to confirm Ockert's identity. Furthermore, Deputy Dailey's subsequent arrest of Ockert was not unlawful because it was not based on Ockert's refusal to consent to the search of his vehicle but because of his lack of a valid license. Finally, the deputies' seizure of evidence from the vehicle was lawful under the plain view and automobile exceptions to the Fourth Amendment's warrant requirement. Based on these findings, the Court will not suppress the evidence obtained from the search of Ockert's vehicle. Ockert's Motion to Suppress is denied.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress (Doc. 35) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 31st day of July, 2018.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE